UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, § § § | |
| Plaintiff, § | |
| v. § | CIVIL ACTION NO. H-03-04658 |
| § | |
| BRUCE E. SNYDER, JR, § § | |
| Defendant. § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Defendant's Motion for Judgment as a Matter of Law (Docket # 220) and Defendant's Renewed Motion for Judgment as a Matter of Law (Docket # 247). For the reasons set forth below, these motions are **DENIED**.

**I. BACKGROUND**

This case involves various securities fraud allegations against Defendant, the former Vice President and Chief Accounting Officer of Waste Management, Inc. ("WMI"). Plaintiff alleges that Defendant filed a materially false and misleading Form 10-Q for the first quarter of 1999, in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and that Defendant aided and abetted WMI's filing of a materially false and misleading Form 10-Q for the first quarter of 1999, in violation of Section 20(e) of the Securities Exchange Act. Plaintiff also alleges that Defendant committed insider trading, in connection with his sales of WMI stock on May 17, 1999 and on June 9, 1999, in violation of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act, and Rule 10b-5.

A jury trial on Defendant's liability for these allegations began on January 3, 2006. At the close of Plaintiff's case-in-chief, and again at the conclusion of all the evidence, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), contending

1

that Plaintiff had failed to present legally sufficient evidence for the jury to find in its favor on any of its causes of action. The Court deferred its ruling in each instance. On January 31, 2006, the case was submitted to the panel of eleven jurors. The jury returned its verdict the following day, on February 1, 2006, finding that Plaintiff had proven, by a preponderance of the evidence, that Defendant had committed all of the alleged violations.

Defendant timely filed his renewed motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b). Defendant asserts that there was no evidence to support a finding that Defendant had the necessary degree of scienter with respect to the filing of the Form 10-Q, or to support a finding of scienter with respect to the June 9, 1999 stock transaction.[1] In response, Plaintiff contends that Defendant has failed to show the absence of a substantial evidentiary basis for the jury's verdict. The Court conducted a hearing on Defendant's renewed motion for judgment on April 20, 2004, thereafter giving both parties the opportunity to submit supplemental briefs. Having considered the parties' briefs and oral arguments, the Court finds that Defendant's motion should be denied, and that the jury's verdict of liability should stand.

## II. ANALYSIS

### A. Judgment as a Matter of Law Standard

Pursuant to Federal Rule of Civil Procedure 50, judgment as a matter of law should be entered if, after a party has been fully heard by the jury on a given issue, "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002); FED. R. CIV. P. 50. In making this determination, a court "must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or

---

[1] Defendant's scienter is the only element in dispute at this stage of the case. Defendant does not dispute that Plaintiff proved the other elements of his alleged violations.

2

weigh the evidence." *Coffel*, 284 F.3d at 631. A mere scintilla of evidence is insufficient to present a question for the jury; rather, there must be a conflict in substantial evidence to create a jury question. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997). "[J]udgment as a matter of law should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Coffel*, 284 F.3d at 630 (internal quotation omitted).

**B. Filing of the Form 10-Q[2]**

*1. Scienter and Severe Recklessness Standard*

In order to establish that Defendant is liable, either for filing a false or misleading Form 10-Q, or for aiding and abetting WMI's filing of the Form 10-Q, Plaintiff had to show that Defendant acted with scienter, a "mental state embracing intent to deceive, manipulate, or defraud." *Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003). In securities fraud cases such as this one, the scienter element can be satisfied by a showing of severe recklessness, which is defined as:

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 245-46 (discussing scienter requirement under Securities Exchange Act Section 10(b) and Rule 10b-5); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (same). *See also SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992) ("To be liable as an aider and abettor, a person must knowingly and substantially assist in the commission of a securities law violation,

---

[2] Plaintiff's false reporting and aiding and abetting allegations relate to the filing of WMI's Form 10-Q for the first quarter of 1999. For the sake of brevity, the Court may refer to WMI's first quarter 1999 Form 10-Q simply as "the Form 10-Q."

with at least a general awareness that his role was part of an overall activity that was improper.") (internal quotations omitted).

Defendant contends that this Court should apply the "no reasonable accountant" formulation of the severe recklessness standard, which was adopted by the court in *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). In that case, the court found that:

> [t]he SEC must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that *no reasonable accountant* would have made the same decisions if confronted with the same facts.

*Id.* (emphasis added) (internal citations and quotations omitted). Although the Fifth Circuit has not addressed this formulation of the severe recklessness standard, at least one district court in this circuit has applied the "no reasonable accountant" formulation in a securities fraud case. *See Fin. Acquisition Partners, L.P. v. Blackwell*, 2004 WL 2203253 at *21 (N.D. Tex. 2004) ("To show scienter . . . Plaintiffs must plead facts which give rise to a strong inference that no reasonable accountant, facing the same facts, would have made the same decisions as [Defendants].").

The Court declines explicitly to adopt the "no reasonable accountant" formulation, for two reasons. First, the Court has already heard arguments from both parties regarding the appropriate scienter standard, in the context of jury instructions. There, the Court adopted the formulation articulated by the Fifth Circuit, instructing the jury that "[s]evere recklessness means an extreme departure from the standards of ordinary care that presented a danger of misleading buyers or sellers, which was either known to [Defendant] or so obvious that he must have been aware of it." Court's Instructions to the Jury at 12. The Court has no reason to doubt that this formulation accurately states the severe recklessness scienter standard.

4

Second, the Court finds that its "extreme departure from the standards of ordinary care" formulation and the "no reasonable accountant" formulation are substantively identical, and that Defendant's motion for judgment as a matter of law must be denied under either phrasing of the scienter standard. Defendant has clarified that he is not contending that he is entitled to judgment as a matter of law simply because he presented evidence that other accountants agreed with him. Def.'s Reply at 3. Indeed, such a position would be untenable, as courts have held that a battle of experts alone does not entitle a securities fraud defendant to judgment in his favor. *See In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 500 (S.D.N.Y. 2005) ("[T]he submission of two competing [expert] reports, without more, neither prohibits a jury from determining that an auditor acted recklessly, nor compels summary judgment for an auditor."). Rather, Defendant contends that he is entitled to judgment as a matter of law because Plaintiff failed to produce competent evidence that he acted in bad faith, and because of the overwhelming evidence of Defendant's good faith and of reasonable disagreements among accountants in this case. The Court will consider these contentions in turn.

## 2. Evidence of Defendant's Severe Recklessness

Plaintiff has sought to establish Defendant's scienter though circumstantial evidence, which is entitled to as much weight as direct evidence of Defendant's state of mind. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) (finding that "the proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence . . . circumstantial evidence can be more than sufficient"). As Plaintiff correctly notes, the evidence presented must be considered as a whole. *See, e.g.*, *United States v. Garza*, 990 F.2d 171, 175 (5th Cir. 1993) ("We do not consider each piece of potential evidence separately, rather we review the evidence as a whole to determine its sufficiency."). Here, Plaintiff's evidence of scienter consisted primarily of the expert testimony of Sally L. Hoffman, a Certified Public

5

Accountant and Certified Fraud Examiner, as well as a number of exhibits to which Hoffman referred. Hoffman testified extensively on two different occasions: as part of Plaintiff's case-in-chief, and again in its rebuttal. Both times she was subjected to vigorous cross-examination. Hoffman opined that the nondisclosure of certain adjustments to income in the footnotes and Management's Discussion and Analysis ("MD&A") section of WMI's Form 10-Q for the first quarter of 1999 made the Form 10-Q materially misleading. Hoffman testified that, to someone with Defendant's training, education, information, and experience with WMI, it would have been obvious that not disclosing these adjustments in the Form 10-Q rendered it materially misleading.

Contrary to Defendant's assertion that this opinion was conclusory, Hoffman testified in great detail as to the particular accounting rules that required disclosure of certain adjustments in WMI's Form 10-Q, the nature of these adjustments, the reasons why the applicable rules required disclosure of these specific adjustments, and how the nondisclosure of these adjustments rendered the Form 10-Q false and misleading. For example, Hoffman explained that, under generally accepted accounting principles, adjustments to a public company's income arising from activities that are not representative of the company's ongoing business would need to be disclosed in the Form 10-Q if, when aggregated, they had a material effect on the company's income. Hoffman testified that Defendant was aware of adjustments that were not representative of WMI's ongoing business, and that Defendant was aware that these aggregated adjustments materially affected WMI's income for the first quarter 1999. Hoffman also testified about the specific information that Defendant had, and how this information would have made it obvious to him that the adjustments were required to be disclosed in the Form 10-Q.

Plaintiff's Exhibit 82A is one example of such information known to Defendant prior to the filing of the Form 10-Q, and consists of an April 26, 1999 memorandum sent to Defendant

and other WMI officers. As Hoffman testified, this exhibit contains a list of "closure/post closure adjustments" for WMI's eastern area, totaling approximately $47.3 million in the aggregate. Pl.'s Ex. 82A. Hoffman went on to testify that changes in closure and post-closure costs are types of adjustments that are not representative of WMI's regular business, and that the adjustments listed in Exhibit 82A were notable because they all increased WMI's income. Hoffman testified that this exhibit would have raised a red flag for Defendant that WMI's income from the eastern area included approximately $47.3 million in adjustments that were not representative of WMI's usual business, and which, when aggregated with other adjustments, would need to be disclosed in the Form 10-Q.

Defendant argues that Hoffman's testimony relating to Exhibit 82A is based upon erroneous and conclusory assumptions, and that, therefore, the Court should disregard it. As Defendant points out, Hoffman based her conclusion that the $47.3 million consisted of adjustments to closure and post-closure costs on the fact that the list was titled "Closure/Post Closure Adjustments," rather than on her own research into the nature of WMI's eastern area adjustments. Defendant asserts that the eastern area engineers were "just using closure/post-closure costs to determine the amount of excess environmental remediation reserves," which would have properly been included in WMI's first quarter income. Def.'s Post-Argument Submission at 4. Defendant also asserts that Hoffman's testimony is illogical because, if Hoffman was correct that the adjustments shown in Exhibit 82A were adjustments to closure/post-closure costs, then all $47.3 million should have been listed as proposed adjusted journal entries for possible exclusion from income, rather than simply disclosed in the Form 10-Q. Defendant further urges that Hoffman's testimony relating to Exhibit 82A is contradicted both by Arthur Andersen's conclusion that $23 million of the eastern area adjustments were properly made to WMI's environmental remediation reserves, and by Hoffman's own testimony

that the eastern area adjustments shown in another exhibit, Plaintiff's Exhibit 88, were corrections of errors in previously reported financial statements.

Each of these arguments goes to the credibility and weight to be accorded Hoffman's testimony. The Court must refrain from making such credibility determinations or weighing the evidence in its consideration of Defendant's motion for judgment as a matter of law. *Coffel*, 284 F.3d at 631. That Hoffman based her characterization of the adjustments shown in Exhibit 82A on the title of the list does not render Hoffman's testimony so incompetent as to require its exclusion, nor do contradictory facts or testimony. Defendant's contentions are ones that he should have argued, and did argue, before the jury, and they do not require the Court to disregard Hoffman's testimony as to Exhibit 82A. Accordingly, Exhibit 82A and Hoffman's related testimony constitute evidence that Defendant knew of adjustments to WMI's first quarter income, which were not representative of WMI's normal business.

In addition to Exhibit 82A, Hoffman discussed Plaintiff's Exhibit 88, another schedule of eastern area adjustments, this time totaling approximately $70 million. Hoffman testified that the descriptions of the items on this schedule as "correction[s] of error" and the terms "correct" and "correcting" show that these items were corrections of error, which, when aggregated with other adjustments, were required to be disclosed. Hoffman further testified that the schedule had been prepared at the direction of Defendant between April 16 and May 3, 1999, prior to the filing of the Form 10-Q. Hoffman opined that Defendant's knowledge of these "correction" entries should have made it obvious to him that the adjustments had to be disclosed in the Form 10-Q.

Defendant attacks this exhibit and Hoffman's related testimony, as well. Defendant contends that Hoffman's characterization of all of the items as corrections of error mistakenly rests upon the description of only one item (relating to the Vickery Deepwell landfill) as a

8

"correction of error."[3] Defendant again asserts that Hoffman's characterization of the adjustments is contradicted by Arthur Anderson's conclusions that almost all of the eastern area adjustments related to remediation reserves and would not require disclosure. Finally, Defendant argues that there is no evidence that Defendant ever considered the items listed in Exhibit 88 to be corrections of error.

Defendant is correct that there is no direct evidence that Defendant considered the items listed in Exhibit 88 to be corrections of error. However, Hoffman's testimony and the exhibit itself constitute circumstantial evidence that Defendant knew that at least some of the adjustments could be characterized as corrections of error, which would need to be disclosed in the Form 10-Q if material when aggregated with other adjustments. Defendant's remaining arguments again go to the credibility and weight of Hoffman's testimony, which the Court may not assess in its determination of the motion for judgment as a matter of law. Like Exhibit 82A, Exhibit 88 shows that Defendant was aware of adjustments to WMI's first quarter income that were not representative of WMI's recurring business.

Plaintiff's Exhibit 83 also shows that Defendant was aware, prior to the filing of the Form 10-Q, that WMI's income included adjustments from occurrences that were not part of WMI's regular business. Exhibit 83, a memorandum dated May 3, 1999 and sent to Defendant, explains that $39.6 million in EBIT (earnings before interest and taxes) for a WMI subsidiary had resulted from changes in accounting method. Pl.'s Ex. 83. Hoffman testified that such income adjustments from changes in accounting method would need to be disclosed if material, and that this was absolutely something that a trained accountant, like Defendant, would recognize.

Additionally, Hoffman testified that schedules prepared by Defendant or his staff after the filing of the Form 10-Q showed that Defendant was aware of many adjustments to WMI's

---

[3] The terms "correct" or "correcting" also appear in the descriptions of other items listed in Plaintiff's Exhibit 88.

income that were not representative of WMI's ongoing business, and that these adjustments, when aggregated, were material to WMI's first quarter 1999 income. Plaintiff's Exhibit 92, which was the subject of much testimony and argument during the trial, consists of a list prepared by Defendant, labeled "Nonrecurring adjustments." Pl.'s Ex. 92. Although the term "nonrecurring" is not a technical accounting term, Hoffman testified that Defendant's use of the term showed that he recognized that the adjustments listed were not likely to occur regularly in WMI's business. Defendant similarly used the term "nonrecurring," as well as "corrections of prior years," in another list of adjustments, which was marked as Plaintiff's Exhibit 91. Hoffman testified that the aggregate amount of adjustments listed in Exhibit 92, which, though erroneously listed as $95.7 million, actually totaled over $100 million, was both quantitatively and qualitatively material to WMI's first quarter 1999 income. The adjustments, therefore, needed to be disclosed in the Form 10-Q.[4] According to Hoffman's testimony, it would have been obvious to an accountant with Defendant's training and information that these adjustments, which were not representative of WMI's regular business, were material in the aggregate and were required to be disclosed in the Form 10-Q.

Defendant contends that there is no evidence that he ever believed that items five through seven listed in Exhibit 92 were unusual items that were required to be disclosed, or that the failure to disclose these items was an extreme departure from the ordinary standard of care. This argument ignores the circumstantial evidence produced at trial. On the contrary, Hoffman testified at length as to each item listed in Exhibit 92, reaching the conclusion that each item, including items five through seven, was not representative of WMI's usual and ongoing business. For items five and six, relating to the eastern area landfills, Hoffman relied mainly

---

[4] Defendant testified that he compiled the list shown in Exhibit 92 from adjustments that he remembered from the first quarter. Similarly, the adjustments listed in Plaintiff's Exhibits 82A, 88, and 83, of which Defendant was aware prior to the filing of the Form 10-Q, totaled over $100 million.

10

upon the exhibits and principles already discussed above. For item seven, pertaining to a reduction in an environmental covenant, Hoffman explained that this adjustment was unusual because it encompassed a review of five years, rather than the quarterly (three-month) reviews that were WMI's regular practice. Similarly, Professor Robert J. Sack, a Certified Public Accountant with long experience in accounting and auditing for public companies, who is now on the faculty of University of Virginia's Business School, offered expert testimony that the environmental covenant adjustment did not arise from, and was not representative of, WMI's ongoing business.

Both Hoffman and Sack testified that generally accepted accounting principles required the disclosure of all of the items listed in Exhibit 92, and Hoffman testified that, based upon the information that Defendant possessed, it would have been obvious to him that failing to disclose these items would make the Form 10-Q materially misleading. Plaintiff also pointed to the fact that Defendant included items five through seven in his list entitled "nonrecurring adjustments." While Defendant testified that he did not believe these items to be required disclosures, this does not negate Plaintiff's substantial evidence that Defendant was aware of the adjustments in WMI's first quarter 1999 income that were not representative of its ongoing business and material in the aggregate, and thus, required to be disclosed in the Form 10-Q.

Finally, Plaintiff introduced Defendant's handwritten notes from an April 26, 1999 discussion with WMI's area vice presidents and other officers, as evidence of his awareness that the first quarter adjustments had boosted WMI's earnings. Pl.'s Ex. 104. On the final page of the notes, Defendant noted that "we need operating results, not just JEs," which Defendant testified referred to journal entries, like the adjustments listed in Exhibit 92. Similarly, Plaintiff referred to Defendant's notation of "Acctg Solutions?" in the margin of the page. While this is also not direct evidence of Defendant's scienter, it demonstrates his awareness of the impact of

11

accounting procedures and income adjustments on WMI's financial filings. From this, in combination with the testimony and exhibits discussed above, the jury could have reasonably inferred that Defendant acted with severe recklessness in his filing of the Form 10-Q.

As Defendant correctly notes, expert testimony that is unsupported by evidence or based upon incorrect factual assumptions cannot support a jury verdict. *See Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone.") (internal quotation omitted). Contrary to Defendant's assertions, however, the expert testimony provided by Hoffman and Sack was set forth in detail and supported by documentary evidence. Defendant has failed to show that Hoffman's testimony should be disregarded, and the Court cannot sustain arguments that Hoffman's testimony was wanting in either weight or credibility. Through the testimony and exhibits just discussed, Plaintiff presented substantial circumstantial evidence of Defendant's scienter, which was sufficient to support the jury's verdict in its favor.

### 3. Evidence Showing an Absence of Severe Recklessness

Similarly, although Defendant also produced substantial evidence that he was not severely reckless, but instead acted in good faith, this evidence was not so overwhelming as to preclude a reasonable jury from reaching a verdict against him.

Defendant first points to the testimony of Arthur Andersen accountants John King, Steve Brown, and Phil Wedemeyer, who testified that they did not believe WMI's Form 10-Q to be materially false or misleading. As Defendant correctly asserts, the accountants testified that they were aware of no facts that were known to Defendant but not to them, prior to the filing of the Form 10-Q. As part of their engagement with WMI, the Arthur Andersen accountants read the entire first quarter Form 10-Q before it was filed, including the financial statements, footnotes, and Management's Discussion and Analysis ("MD&A"). After this review, Arthur Andersen

12

issued its Report of Independent Public Accountants, which stated that, "[b]ased on our review, we are not aware of any material modifications that should be made to the financial statements . . . for them to be in conformity with generally accepted accounting principles." Def.'s Ex. 5.

Defendant argues that Arthur Andersen's approval of the Form 10-Q is fatal to Plaintiff's case, because it demonstrates that reasonable accountants could find that the Form 10-Q was not materially misleading, and therefore, that Defendant could not have acted with severe recklessness. Plaintiff rebutted this argument with evidence that Arthur Andersen's review of the Form 10-Q was only a limited one, which involved no analysis of whether all required disclosures had been made in the MD&A section. Although they read the MD&A, King, Brown, and Wedemeyer testified that Arthur Andersen was not asked to provide an opinion as to whether any particular adjustments needed to be disclosed in the MD&A, or whether the MD&A made all necessary disclosures. Additionally, Plaintiff points to testimony from Brown that, as an auditor, Arthur Andersen likely did not have all of the information that WMI had, as well as King's testimony that personnel at WMI's corporate headquarters would have had more knowledge than Arthur Andersen about the eastern area landfills. This does not, of course, show that Defendant necessarily had any information that Arthur Andersen did not have.

As the Court instructed the jury, in order for Defendant to have relied upon the advice of Arthur Andersen, Defendant had to make several showings, including that he fully disclosed all relevant facts to Arthur Andersen, that he specifically sought an opinion about the particular point on which he claimed reliance, and that he actually received such an opinion. *See United States v. Peterson*, 101 F.3d 375, 381-82 (5th Cir. 1996) (discussing good faith reliance on the advice of counsel). Although Defendant points to evidence that Arthur Andersen was aware of all facts relevant to the Form 10-Q disclosures, and although Defendant showed that Arthur Andersen accountants reviewed the MD&A, Plaintiff's contradictory evidence may have led a

13

reasonable jury to question Defendant's reliance on Arthur Andersen. As Defendant points out, however, even if he cannot be said to have relied upon Arthur Andersen's review, the fact that required disclosures were not obvious to the Arthur Andersen accountants tends to negate a finding that Defendant acted with severe recklessness – that his actions constituted such an extreme departure from the standards of ordinary care that the danger of misleading buyers or sellers was so obvious that Defendant must have been aware of it.

Additionally, Defendant presented the expert testimony of Stephen McEachern, a Certified Public Accountant with experience in the waste industry, who testified that he did not believe any additional disclosures were needed to WMI's Form 10-Q in order to make it conform to generally accepted accounting principles. McEachern also specifically opined that none of the items listed in Plaintiff's Exhibit 92 as "nonrecurring adjustments" had to be disclosed in the Form 10-Q, and he disagreed with Hoffman's opinion that the misleading nature of the Form 10-Q would have been obvious to Defendant. McEachern's testimony is additional evidence of Defendant's good faith. As Plaintiff brought out in cross-examination, however, McEachern did not possess the same level of experience with accounting for public companies as did Hoffman or Sack, as McEachern had never audited a profitable publicly-traded company, like WMI. Although the Court must avoid credibility determinations or weight assessments, it does not follow that no reasonable jury could have given more credit to the testimony of Hoffman and Sack than it did to McEachern's testimony.

Bearing in mind its obligation to draw all reasonable inferences in favor of Plaintiff, the Court cannot conclude that Arthur Andersen's role in the preparation of WMI's Form 10-Q, or the accountants' lack of disagreement with Defendant mandate a judgment in Defendant's favor. *Coffel*, 284 F.3d at 631 (finding that the court must "draw all reasonable inferences in favor of the nonmoving party"). Nor can the Court find that McEachern's testimony precluded a finding

14

that Defendant had been severely reckless. As the Fifth Circuit has recognized, "judgment as a matter of law should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Coffel*, 284 F.3d at 630 (internal quotation omitted). The Court cannot conclude that this is the case here. Although Defendant presented evidence of his good faith, it was not so overwhelming as to preclude a verdict for Plaintiff. Moreover, as discussed above, Plaintiff offered sufficient evidence of Defendant's scienter, from which the jury could have reasonably concluded that Defendant was severely reckless. Accordingly, a judgment as a matter of law for Defendant as to his filing of a materially misleading Form 10-Q, and as to his aiding and abetting WMI's filing of a materially misleading Form 10-Q would be improper.

**C. June 9, 1999 Insider Trading Charge[5]**

*1. Scienter Requirement*

In order to establish that Defendant is liable for insider trading, arising from his sale of WMI stock on June 9, 1999, Plaintiff similarly had to prove the element of scienter. That is, Plaintiff had to prove that Defendant possessed material, nonpublic information at the time of the trade, and that he intentionally used this material, nonpublic information in making the trade. *SEC v. Ginsburg*, 362 F.3d 1292, 1297-98 (11th Cir. 2004). Proof that Defendant had knowledge of material, nonpublic information at the time that he made the trade gives rise to a strong inference that Defendant used the information. *Id.* at 1298; *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998). To have acted intentionally, Defendant must have acted knowingly and

---

[5] The jury found Defendant liable for insider trading in connection with both his June 9, 1999 and his May 17, 1999 stock transactions. Defendant's briefs in support of his renewed motion for judgment as a matter of law, however, refer only to the June 9, 1999 transaction. While it appears that Defendant is not pursuing judgment as a matter of law as to the May 17, 1999 transaction, the Court notes that the analysis set forth below applies to Defendant's alleged insider trading with respect to both transactions. Although the June 9, 1999 WMI meeting described below had not yet taken place at the time of Defendant's May 17, 1999 transaction, Plaintiff's other evidence applies to the May 17, 1999 transaction and is sufficient to withstand a motion for judgment as a matter of law.

15

with an intent to deceive, or with reckless disregard of the consequences. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). As discussed above, Defendant's knowledge and intent may be established by circumstantial evidence. *Herman & MacLean*, 459 U.S. at 390 n.30. Here, Plaintiff contends that Defendant sold WMI stock on June 9, 1999 on the basis of his material, nonpublic information that WMI would likely fail to meet its expected earnings for the second quarter of 1999.

## 2. Evidence of Defendant's Scienter

Plaintiff presented a variety of evidence at trial, from which the jury could have reasonably concluded that Defendant knew or recklessly disregarded that WMI's internal projections for the second quarter of 1999 showed shortfalls in earnings from operations. First, Defendant participated in a conference call with other WMI officers and WMI's five area vice presidents on April 26, 1999, to discuss the projected EBIT, or earnings, for each of the five areas. Four out of the five area vice presidents – Robert Damico, Charles Wilcox, Miller Matthews, and Douglas Sobey – testified that they reported projections that fell short of WMI's second quarter budget. The fifth area vice president, David Sutherland-Yoest, projected meeting his area's budget.

Defendant made several pages of handwritten notes during this call, on the last page of which he noted, "Short $110 M." Pl.'s Ex. 104. Defendant testified that this notation indicated that the projections given by the area vice presidents added up to a $110 million shortfall from WMI's budget. Defendant similarly made a note of, "If we are $.11 short for Q2-99," which he testified indicated a potential shortfall of eleven cents in earnings per share for the second quarter of 1999. Pl.'s Ex. 104. Defendant also made handwritten notes on a copy of WMI's 1999 base budget during the April 26, 1999 conference call. Pl.'s Ex. 103. Adding a "Q2" column, Defendant noted the EBIT projections reported by each area vice president, as well as the

16

amount of the shortfall from the budgeted EBIT, in earnings per share, for the four areas reporting shortfalls. Defendant then added up the shortfalls, which totaled $.11 in earnings per share. Defendant testified that on a per-share basis, this meant that the projections reported by the area vice presidents would make WMI eleven cents short of meeting its budgeted earnings.

Additionally, Defendant participated in meetings with the area vice presidents and other WMI officers on May 3, 1999 and June 9, 1999. At these meetings, the area vice presidents testified that they reported projections similar to those reported during the April 26, 1999 conference call, with four out of the five areas projecting shortfalls from their budgeted EBIT. Defendant testified that he did not remember any of the area vice presidents, except for Sutherland-Yoest, report that their areas would meet their expected earnings, as provided in WMI's budget. Defendant also testified that he was aware of a schedule prepared by his staff in May 1999, which reflected a shortfall in WMI's EBIT of $.11 per share. Pl.'s Ex. 111.

Plaintiff points out that the evidence discussed earlier, showing that Defendant knew of the undisclosed adjustments to WMI's first quarter income, and that these nondisclosures rendered WMI's first quarter Form 10-Q materially misleading, also demonstrates that Defendant was aware of material, nonpublic information at the time he sold WMI stock on June 9, 1999. In addition to allegedly being material, nonpublic information itself, the existence of the undisclosed first quarter adjustments also tends to show that Defendant was aware that WMI was failing to meet its projected earnings, and that, therefore, the price of WMI stock might decrease. This, in combination with Plaintiff's evidence that Defendant knew that WMI would likely fail to meet its expected earnings for the second quarter of 1999, gives rise to a strong inference that Defendant used this knowledge in his June 9, 1999 sale of WMI stock.

Defendant attacks the reliability of this evidence on a number of grounds. Defendant points out that each of the area vice presidents, despite reporting shortfalls, expressed optimism

17

about WMI's ability to meet its financial goals for the second quarter of 1999. Indeed, each area vice president testified that, as of the June 9, 1999 meeting, he had no concern as to WMI's ability to meet its second quarter earnings projections. Defendant testified that he, too, felt optimistic as to WMI's ability to meet its budget on June 9, 1999, when he made the sale of WMI stock at issue here. With respect to Plaintiff's Exhibit 111, the schedule showing a shortfall in earnings per share of $.11, Defendant testified that he did not consider this to be reliable or rely on it for any purpose, nor was he aware of anyone at WMI headquarters who would have relied on the schedule for any purpose. Likewise, David Weinheimer, the WMI accounting staff member who prepared the schedule, testified that that the schedule would not necessarily have been a reliable forecast of WMI's performance, as it was prepared with figures from relatively early in the second quarter. Weinheimer testified that, having seen the schedule, he was not concerned that WMI would miss its targeted earnings.

While Defendant's arguments go to the credibility and weight of Plaintiff's evidence – which the Court must not here assess – they do not render Plaintiff's evidence so incompetent or unbelievable that it could not support a jury verdict holding Defendant liable for insider trading.

### *3. Evidence Showing an Absence of Scienter*

Defendant relies on further evidence to show that he could not have made his June 9, 1999 stock transaction on the basis of material, nonpublic information. First, Defendant contends that, although he sold 2,700 shares of WMI stock on June 9, 1999, he bought 8,700 shares of WMI stock, for a net purchase of 6,000 shares. Similarly, Defendant points out that he could have sold substantially more shares of WMI stock on June 9, 1999 than he actually sold, including the other 6,000 shares that he purchased on June 9, 1999, as well as 9,000 shares of WMI stock that he already owned. Defendant also points to the fact that, following his transaction on June 9, 1999, the value of his remaining stock and stock options plummeted. By

selling his additional shares of WMI stock on June 9, 1999, Defendant could have avoided these substantial losses.  Finally, Defendant asserts that his June 9, 1999 transaction was conducted pursuant to a legitimate business strategy.  Defendant testified that, by January 1998, he had begun formulating a plan to liquidate some of his WMI stock by exercising and selling his options on a periodic basis.  Defendant designed this plan to avoid having to borrow money each time he exercised options, and to hold the stock for one year to be eligible for the twenty percent capital gains tax rate.  *See* Def.'s Ex. 19 (Defendant's planned schedule for exercising WMI options, and the corresponding cash impact).

As Plaintiff points out, none of these circumstances would prevent Defendant from being liable for insider trading.  For example, courts have held that, "retaining substantial holdings and purchasing or otherwise obtaining shares . . . do[es] not vitiate insider trading liability." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 144 (S.D.N.Y. 1999).  Plaintiff likewise contends that Defendant's business plan for exercising his WMI options and selling them at certain intervals does not reflect a specific, preexisting plan to engage in the June 9, 1999 transaction. As Plaintiff notes, such a generalized intention to sell stock in the future, even for a legitimate purpose, cannot overcome liability for insider trading.  *See SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002).  ("Only if the illegitimate purpose had no causal efficacy because the legitimate one would have caused [the defendant] to sell the shares when he did and in the amount he did would the existence of the legitimate purpose be a defense . . . .").

Although Defendant's evidence does not act as an absolute defense to insider trading liability, it does tend to show that Defendant did not knowingly or recklessly trade on the basis of material, nonpublic information.  Defendant's evidence is not so overwhelming, however, as to negate the evidence presented by Plaintiff or to preclude a reasonable jury from finding in Plaintiff's favor.  Plaintiff presented sufficient evidence of Defendant's scienter with respect to

his June 9, 1999 stock transaction, and a judgment as a matter of law for Defendant on this insider trading allegation is inappropriate.

### III. CONCLUSION

Defendant's Motion for Judgment as a Matter of Law and Renewed Motion for Judgment as a Matter of Law are **DENIED**. A hearing on the issue of an appropriate remedy will held in July 2006, on a date to be set by the Court.

**IT IS SO ORDERED**.

**SIGNED** this 29th day of June, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**