**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND** | § | |
| **EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. H-03-04658** |
| | § | |
| **BRUCE E. SNYDER, JR,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is the issue of the appropriate remedies to be awarded in this case. After a hearing on this matter on July 18-19, 2006, and having considered the briefs and evidence presented by both parties, the Court finds as follows.

**I. BACKGROUND**

This case involves various securities fraud allegations against Defendant, the former Vice President and Chief Accounting Officer of Waste Management, Inc. ("WMI"). The SEC alleges that Defendant filed a materially false and misleading Form 10-Q for the first quarter of 1999, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, and that Defendant aided and abetted WMI's filing of a materially false and misleading Form 10-Q for the first quarter of 1999, in violation of Section 20(e) of the Exchange Act. The SEC also alleges that Defendant committed insider trading, in connection with his sales of WMI stock on May 17, 1999 and on June 9, 1999, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Exchange Act, and Rule 10b-5.

A jury trial on Defendant's liability for these allegations began on January 3, 2006. At the close of the SEC's case-in-chief, and again at the conclusion of all the evidence, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), contending that the

SEC had failed to present legally sufficient evidence for the jury to find in its favor on any of its causes of action.  The Court deferred its ruling in each instance.  On January 31, 2006, the case was submitted to the panel of eleven jurors.  The jury returned its verdict the following day, on February 1, 2006, finding that the SEC had proven, by a preponderance of the evidence, that Defendant had committed all of the alleged violations.  Defendant timely renewed his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  On June 29, 2006, the Court denied Defendant's motion.

The Court must now determine the appropriate remedies to be awarded against Defendant. The SEC seeks four categories of relief:  (1) an injunction against Defendant's further violations of the securities laws; (2) an order prohibiting Defendant from serving as an officer or director of public companies; (3) an order requiring Defendant to disgorge his ill-gotten gains, with prejudgment interest, totaling $115,473.39; and (4) an order requiring Defendant to pay civil money penalties totaling $440,860.00.  The Court will address each requested remedy in turn.

## II. ANALYSIS

### A. Standard of Proof

As the SEC asserts, federal courts have found that the proper standard of proof in SEC enforcement actions is a preponderance of the evidence.  *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004) ("The SEC must prove violations of § 10(b) and § 14(e), and their supplementary Rules, by a preponderance of the evidence, and may use direct or circumstantial evidence to do so."); *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 434-35 (5th Cir. 1981) (finding that the preponderance of the evidence standard should be applied in SEC civil enforcement actions for preliminary injunctive relief, and citing the D.C. Circuit's application of the preponderance of the evidence standard in SEC civil enforcement actions for permanent injunctive relief, *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978)); *see also SEC v. Moran*, 922 F. Supp. 867, 888

(S.D.N.Y. 1996) ("The majority of lower courts which have addressed this issue have determined that in civil enforcement actions the proper standard of proof is preponderance of the evidence"). While the Court recognizes the quasi-criminal nature of this proceeding, as well as the gravity of what is at stake for Defendant, the Court will therefore apply a preponderance of the evidence standard in assessing whether each of the SEC's requested remedies should be awarded.

**B. Injunctive Relief**

Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 20(b) of the Securities Act, 15 U.S.C. §77t(b), authorize the SEC to seek a permanent injunction "upon a proper showing that the defendant is engaged or is about to engage in violations of the securities laws." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (quotations omitted).  The "critical question" in determining whether an injunction should issue is "whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978).  The Fifth Circuit has set forth a number of factors that are relevant to this determination:  (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the violation; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) the likelihood that the defendant's occupation will present opportunities for future violations.  *Id.* at 1334 n.29.  In this case, these factors, on balance, counsel against the issuance of an injunction.

*1. Egregiousness*

The SEC first asserts that the gravity and seriousness of the disclosure requirements of public companies make Defendant's false reporting violation, by its very nature, an egregious act. The Court disagrees, however, as such a conclusion would render it unnecessary for a court ever to undertake an inquiry of egregiousness in cases involving fraudulent reporting violations of Section

10(b) of the Exchange Act.  Although the disclosure obligations of public companies are, and must be considered to be, of critical importance to financial markets and to the integrity of federal securities regulation, their importance does not inevitably mean that every violation is necessarily egregious.  The SEC also argues that Defendant's position as Chief Accounting Officer of a large public company magnified the impact of his actions.  While it is generally the case that the impact of securities fraud will be farther-reaching when committed by a large public company, as opposed to a smaller one or one whose equity is closely held, Defendant's position as Chief Accounting Officer at WMI does not, by itself, show that his actions were egregious.

Additionally, the SEC contends that the egregiousness of a securities fraud violation may be shown by the extent to which the public was deceived about the value of the stock in question.  At the remedies hearing, the SEC presented the expert testimony of Stephen D. Prowse, Ph.D., who testified that, had information about nonrecurring items in WMI's first quarter 1999 income[1] been disclosed to the public in May 1999, when Defendant signed WMI's first quarter 1999 Form 10-Q ("Form 10-Q"), the market price of WMI's stock would have declined by at least $2.91 per share.  As the SEC points out, this would have amounted to a decline of approximately $1.8 billion in the market capitalization of WMI's stock.  Prowse's calculation of the effect of this information on WMI's stock was based upon an event study and valuation analysis, both widely-accepted techniques for determining the impact of fraudulent statements or omissions.  Defendant has demonstrated, however, that there are several reasons to question the accuracy of Prowse's calculation.

---

[1] Recognizing that the term "nonrecurring" is not a term of art within generally accepted accounting principles or generally accepted auditing standards, the Court will use the term to refer to an income adjustment that is not likely to occur regularly in the course of a company's ordinary business.  As noted in the Court's Order of June 29, 2006, the SEC presented testimony at trial that WMI's first quarter 1999 Form 10-Q included $95 million in undisclosed, nonrecurring adjustments.

As Defendant's expert witness, Bruce Den Uyl, testified, Prowse based his event study on a two-day event window following WMI's August 3, 1999 press release, which indicated that WMI was reviewing its first quarter income for the possible inclusion of $95 million in nonrecurring adjustments.  Den Uyl opined that, although WMI's stock price fell during the two days following this press release, Prowse should have considered the stock price's rebound on the third day, when calculating the effect of the news on the stock price.  Additionally, Den Uyl testified that Prowse failed to consider other publicly-available news that could have caused the drop in stock price, including other negative facts contained in the August 3 press release, as well as WMI's July 1999 announcements of lower second quarter earnings per share than previously expected.  Finally, Defendant points out that the August 3 press release did not announce that $95 million in nonrecurring adjustments *had* been included in WMI's first quarter income, but rather, that WMI was investigating this possibility.  As Defendant notes, WMI later announced that only approximately $30.2 million in nonrecurring adjustments had been improperly included in its first quarter income.  Defendant urges that Prowse's analysis should be discounted because it is based upon the effect of inaccurate information that was never actually disclosed – namely, that WMI's first quarter income actually *had* included $95 million in nonrecurring adjustments.

The Court finds that Prowse's testimony was thorough and should not be wholly disregarded on account of Den Uyl's testimony.[2]  Den Uyl's testimony does, however, demonstrate the speculative nature of Prowse's analysis and conclusions.  Although WMI's August 3, 1999 press release regarding the $95 million in possibly nonrecurring adjustments certainly had some impact on WMI's stock price and market capitalization, the Court is unable to conclude that this is enough to make Defendant's violation egregious, so as to warrant injunctive

---

[2] Prowse also raised concerns with the reliability of Den Uyl's opinions.  For example, Prowse testified that the use of a three-day window for an event study concerning a widely traded company like WMI would be unusual and unreasonable.

relief.  Additionally, even if the information about WMI's first quarter adjustments had a $2.91 per share effect on WMI's stock, as Prowse concluded, this is not enough to make Defendant's actions so egregious as to require a permanent injunction.

Finally, the SEC urges that Defendant compounded the egregiousness of his conduct by personally profiting from his inside information, by selling shares of WMI stock on May 17, 1999 and June 9, 1999.  While the jury found Defendant liable for insider trading on these two occasions, these stock sales do not support a finding of egregiousness.  As Defendant showed, although he sold 2,700 shares of WMI stock on June 9, 1999, he bought 8,700 shares, for a net purchase of 6,000.  Similarly, Defendant showed that he could have sold substantially more shares of WMI stock than he actually did, having 15,000 shares available to sell, but selling only 8,200 shares in the May 17 and June 9 transactions combined.  Defendant also presented evidence at trial that his stock transactions were conducted pursuant to a pre-developed business plan.  While the Court has held that this evidence was not sufficient to preclude a reasonable jury from finding Defendant liable for insider trading, it does weigh against a finding that Defendant's sales of stock make his false reporting violation egregious.  Additionally, Defendant's total improperly-gained profit from these sales, as asserted by the SEC, was $73,620.00.  Compared to the losses Defendant suffered by virtue of holding other WMI shares, this figure is not considerable enough to sustain a finding of egregiousness.

For the foregoing reasons, the Court finds that Defendant's actions were not so egregious as to support an award of permanent injunctive relief.

### 2. Isolated or Recurrent Nature

As the SEC points out, the jury found Defendant liable not only for making false statements or omissions in the Form 10-Q, but also for insider trading on two occasions.  Though this particular case involved more than one charge, however, this does not demonstrate that

Defendant has engaged in recurrent violations.  There is no evidence that Defendant engaged in or was accused of engaging in the violation of any securities laws prior to the events of early 1999. Further, there is no evidence that Defendant violated the securities laws subsequent to the events underlying the present case; on the contrary, Defendant signed several later WMI financial statements, with no alleged violations.  The SEC is correct in its assertion that first-time offenders, like Defendant, are not exempt from injunctions or from officer/director bars.  *See, e.g.*, *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974) (finding that "'first offenders' are not immune from injunctive relief").  However, while Defendant's status as a first-time offender does not preclude the issuance of an injunction against him, the isolated nature of his actions weigh against such a remedy.

### 3. Degree of Scienter

The SEC asserts that the Court is bound by the jury's findings, including its implicit finding that Defendant acted at least with severe recklessness, and that the Court may not make any findings that are inconsistent with the jury's findings.  *See, e.g.*, *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1527 (11th Cir. 1984) ("[A]ll findings necessarily made by the jury in awarding the verdict to a party are binding on the parties as well as on the trial court.") (citation omitted). With respect to scienter, the Court instructed the jury members that, in order to find that Defendant committed the false reporting violations, they had to find that he "knew of, or was severely reckless in not knowing of, the materially false or misleading statements and omissions of material fact."  Court's Instructions to the Jury at 11-12.  *See also id.* at 17 (instructing the jury that, in order to be found liable for insider trading, Defendant must have acted "knowingly and with intent to deceive, manipulate, or defraud, or acting with severely reckless disregard of the consequences").  By finding Defendant liable for filing a materially false or misleading Form 10-Q and for insider trading, then, the jury necessarily found that Defendant acted at least with severe

recklessness. The Court further instructed the jury that severe reckless means "an extreme departure from the standards of ordinary care that presented a danger of misleading buyers or sellers, which was either known to [Defendant] or so obvious that he must have been aware of it." *Id.* at 12.

As Defendant notes, evidence of good faith may be a relevant consideration in evaluating scienter. *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) (finding that "reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter"). As discussed in the Court's June 29, 2006 Order, Defendant produced substantial evidence of his good faith at trial, including the testimony of Arthur Andersen accountants John King, Steve Brown, and Phil Wedemeyer, who testified that they did not believe WMI's Form 10-Q to be materially false or misleading, and the expert testimony of Stephen McEachern, who testified that any misleading statements or omissions in the Form 10-Q would not necessarily have been obvious to Defendant. Contrary to the SEC's assertion, the jury's verdict of liability does not mean that the jury rejected this evidence wholesale; however, it does indicate that the jury was more persuaded by the SEC's evidence of scienter. In ruling on Defendant's motion for judgment, the Court found that, despite Defendant's evidence of good faith, the SEC had offered sufficient evidence of Defendant's scienter to permit the jury reasonably to conclude that Defendant was severely reckless. Because the Court must accord due respect to the jury's verdict, the scienter element weighs in favor of granting an injunction against Defendant's future violations.

### 4. Sincerity of Defendant's Assurances Against Future Violations

The Court has heard Defendant's testimony, both at trial and at the remedies hearing, and finds his assurances against future violations to be sincere. Although Defendant maintains that he did not commit the violations of which the jury found him liable, he has consistently demonstrated

an appreciation of the critical importance of the securities laws and regulations, as well as the seriousness of the charges and verdict against him. Defendant has clearly experienced immense suffering as a result of this proceeding, and the Court believes his testimony to be genuine. Defendant's testimony establishes a strong likelihood that he will take great pains to avoid violations of securities laws in the future. Defendant has further testified that he has no expectation of ever again working at a public company, which also constitutes an assurance against future violations. The sincerity of Defendant's assurances against future violations counsels strongly against the issuance of any injunction.

### 5. Defendant's Recognition of Wrongfulness

The SEC argues that Defendant's insistence that he did not commit the acts of which the jury found him to be liable shows that he cannot be trusted to comply with the securities laws, and thus, demonstrates the need for injunctive relief. Defendant's continuing claim of innocence, however, does not negate the testimony discussed above, which demonstrates Defendant's grasp of the importance of securities laws. Additionally, as shown through McEachern's expert testimony at trial, accountants may disagree as to whether or not Defendant's actions violated the securities laws. While this was not enough to make the jury's verdict of liability wholly unreasonable, so as to warrant judgment as a matter of law, it does tend to provide some reasonable basis for Defendant's maintenance of his innocence. Moreover, the kind of admission the SEC seeks would eliminate all of Defendant's appellate rights. In sum, although Defendant's failure to acknowledge the wrongfulness of his actions does lend support to the SEC's request for injunctive relief, this support is minimal at best.

### 6. Opportunities for Future Violations

Finally, the SEC contends that Defendant's current position as a Certified Public Accountant ("CPA") presents him with an opportunity to commit future violations. To be sure,

the SEC is correct that some accountants confront situations in which they could violate securities laws, but the evidence presented at the remedies hearing shows that this is extremely unlikely in Defendant's case.  Defendant testified that, after he left WMI, he began working for his friend, Keith Linduff, a CPA in Norman, Oklahoma.  Linduff is a tax accountant and provides accounting services for individuals and for some private companies.  Linduff does not perform any work for public companies.  Defendant works for Linduff as a sub-contractor, and while he performed substantial contract controller services for one of Linduff's clients in 2005, he no longer is welcome to do so, on account of the jury's verdict against him.  There is no evidence that Defendant's current position as a contractor for Mr. Linduff will provide him with any meaningful opportunity to commit future violations.  This factor also cuts against an award of injunctive relief.

While the jury's finding of scienter provides some support for the issuance of an injunction, the lack of egregiousness of Defendant's actions, their isolated nature, the sincerity of his assurances against future violations, and the absence of any realistic opportunities for future violations counsel strongly against injunctive relief.  Accordingly, the SEC's request for  an injunction against Defendant's further violations of the securities laws is **DENIED**.

### C. Officer/Director Bar

The federal securities laws authorize a court to bar a defendant from acting as an officer or director of a publicly-traded company if he or she is found to have violated Section 10(b) of the Exchange Act or Section 17(a)(1) of the Securities Act.  15 U.S.C. §§ 78u(d)(2), 77t(e).  At the time of Defendant's violations in 1999, these laws authorized the imposition of such an officer/director bar "if the person's conduct demonstrates substantial unfitness to serve as an officer or director."  15 U.S.C. §§ 78u(d)(2), 77t(e) (1999).  Courts generally consider six factors in determining whether to impose an officer/director bar:  (1) the egregiousness of the underlying securities law violation; (2) whether the defendant is a repeat-offender; (3) the defendant's role or

position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the defendant's misconduct will recur. *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998).   While these factors are considered useful, a court need not apply all of these factors in a given case, nor is a court limited to these six.   *Patel*, 61 F.3d at 141 ("A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company.").

### 1. Egregiousness

As discussed above, the Court finds that Defendant's actions were not so egregious as to support an award of permanent injunctive relief.   This lack of egregiousness weighs against the imposition of an officer/director bar, as well.

### 2. Repeat Offenses

The Court also finds Defendant's actions to be isolated in nature, as there is no evidence that Defendant has committed any violations of the securities laws, other than those with which he is charged in this case.   As discussed above, this counsels against any award of injunctive relief.   It also tends to show that the imposition of an officer/director bar would be inappropriate.

### 3. Defendant's Role or Position

This factor seems to cut both ways.   As the SEC asserts, Defendant held the high-level position of WMI Chief Accounting Officer at the time that he personally signed the Form 10-Q. As the Chief Accounting Officer, Defendant was required to sign the Form 10-Q before it could be filed; and in signing the Form 10-Q, Defendant had a responsibility to ensure that its financial information was fairly reported and in accordance with generally accepted accounting principles. The SEC argues that Defendant's high-level position and high degree of responsibility shows that he was at the center of the fraud, and that an officer/director bar is necessary.

As Defendant asserts, however, WMI's internal structure at the time that the Form 10-Q was filed was a collaborative one, in which Defendant had to reply upon the efforts of the area vice presidents and the persons in each area who were responsible for compiling the financial information. Defendant also relied upon the exercise of judgment by WMI's landfill engineers and area controllers. Defendant, for example, relied upon the engineers' characterization of certain adjustments to income as closure/post-closure costs or as remediation reserves. The Court agrees that WMI's collaborative structure and Defendant's necessary reliance on the judgment of other WMI employees at least mitigates the effect of his responsibility as Chief Accounting Officer, as to this factor. Accordingly, Defendant's position and role weigh neither for nor against the imposition of an officer/director bar in this case.

### 4. Degree of Scienter

As discussed above, the Court must give appropriate deference to the jury's verdict, which implicitly includes a finding that Defendant acted at least with severe recklessness. Just as the scienter element weighs in favor of granting injunctive relief, then, it also provides support for the imposition of an officer/director bar.

### 5. Economic Stake in the Violation

The SEC argues that Defendant had a substantial economic stake in committing the false reporting violation, in several ways. First, the SEC notes that Defendant's stock options, including both vested and non-vested options, were valued at $1,404,483 prior to the filing of the Form 10-Q, as measured by the market price of WMI stock on May 5, 1999. This provided Defendant with an incentive to keep WMI's stock price up, as a fall in the stock price would cause a decrease in the value of his own stock options. As the SEC points out, by August 3, 1999, when the public had been informed of the possibility of nonrecurring adjustments having been included in WMI's first quarter income, Defendant's stock options were worth under $12,000. In addition

to the Defendant's stake in his WMI options, the SEC contends that Defendant committed the violations in order to protect his job and maximize his potential bonus compensation.  As the SEC correctly asserts, WMI's compensation to senior management, like Defendant, was based in part upon the company's meeting its earnings-per-share goals.  In addition to his salary of $225,000, for example, Defendant received a bonus of $112,000 in 1999, attributable to his work in 1998. Finally, the SEC contends that Defendant actually reaped profits from his fraud – by using material, non-public information to sell stock on May 17 and June 9, 1999.

Defendant urges that these arguments are spurious, contending that the "truth" about the first quarter adjustments, which the SEC alleges that Defendant hid in order to protect the value of his stock options, is itself untrue.  Defendant argues that no one has determined that the Form 10-Q contained $95 million dollars in nonrecurring income, including the jury.  Contrary to Defendant's assertion, however, it would seem that the jury must have found that the Form 10-Q contained materially false or misleading statements, in order to have found Defendant liable for the false reporting violation.[3]   Thus, Defendant's interest in his stock options and bonus compensation tends to lean in favor of an officer/director bar.

Defendant also points out that, although he sold WMI stock on May 17 and June 9, 1999, the fact that he was a net buyer of WMI stock from May through June 1999 contradicts the SEC's theory that he actually repeated profits from his fraud.  Defendant notes that, had he been concerned with reaping profits, he could have exercised and sold all of the 15,000 shares that he had available on June 9, 1999, rather than the only 2,700 shares that he actually sold.  The Court agrees that Defendant's net purchase of WMI stock negates the SEC's theory that Defendant actually reaped an economic benefit from his actions.  Despite this, however, Defendant's stock

---

[3] As the Court instructed the jury, to prevail on its false reporting claim, it had to prove that Defendant "made one or more false or misleading statements of material fact, or omitted to state material facts."  Court's Instructions to the Jury at 10-11.

options and bonus compensation seem to have given him a not insignificant economic stake in WMI's stock price.  This economic stake provides at least some support for the issuance of an officer/director bar.

### 6. Likelihood of Recurrence

Finally, the SEC argues that Defendant's strenuous opposition to an officer/director bar demonstrates an intent to seek such an officer or director position in the future.  The SEC additionally points to witnesses who testified at trial as to Defendant's good character and integrity, and to the fact that these witnesses also testified that they would hire Defendant as a senior corporate officer if permitted to do so.  According to the SEC, this evidence that Defendant intends to return to a corporate officer position, combined with his continuing refusal to acknowledge wrongdoing, demonstrates a likelihood that future violations will occur unless Defendant is barred from obtaining an officer or director position.

The Court disagrees.  The overwhelming evidence presented at trial and at the remedies hearing establishes that Defendant has no realistic chance of ever again obtaining a position as an officer or director of a public company.  Although many witnesses testified that, because of their belief in Defendant's honesty and competence, they would hire him as a corporate officer in the future, this does not establish that these witnesses actually could hire Defendant for such a position.  On the contrary, William Trubeck, the former CFO of WMI, testified that the jury's verdict of liability would prevent Defendant from ever again obtaining employment as the Chief Accounting Officer or as a senior officer of a public company, as it would be difficult or impossible to convince a board of directors to approve his hiring.  Although the SEC argues that Mr. Trubeck failed to address the possibility that Defendant might be hired for a lower-level officer position with a public company or an officer position with a smaller public company or private company, the events of the last few months demonstrate that this is very unlikely.  As

Defendant testified, the only employment that he has been able to secure is sub-contract accounting work for Linduff; and since the jury rendered its verdict of liability, at least one of Linduff's private clients has refused to allow Defendant to continue to perform work for it.  There is no evidence that Defendant's current position as a contractor for Mr. Linduff, or any position that he may be able to secure in the future, will provide him with any meaningful opportunities to violate securities laws.  Further, as discussed above, the sincerity of Defendant's assurances against future violations shows that the likelihood of recurrence is minimal, at best.

As with injunctive relief, the jury's finding of scienter lends some support to the SEC's demand for an officer/director bar, as does Defendant's economic stake in the false reporting violation.  The lack of egregiousness, the isolated nature of Defendant's actions, and the strong unlikelihood of Defendant's ever obtaining another officer/director position or committing future violations, however, show that an officer/director bar would be unnecessary and unwarranted in this case.  The Court, therefore, declines to issue an officer/director bar, and the SEC's request for such a bar is **DENIED**.

### D. Disgorgement

A court may also exercise its equitable powers to order a defendant to "disgorge the profits that he obtained by fraud."  *Blatt*, 583 F.2d at 1335.  Disgorgement serves the purpose of "forc[ing] the defendant to give up . . . the amount by which he was unjustly enriched," so as to "deprive the wrongdoer of his ill-gotten gain."  *Id.*  Before a court can order disgorgement, the SEC must provide a reasonable approximation of profits or losses avoided and show that the defendant's violations proximately caused these profits or avoided losses.  *See, e.g.*, *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) ("The amount of disgorgement 'need only be a reasonable approximation of profits causally connected to the violation.'") (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  The amount of disgorgement should thus be "the

amount with interest by which the defendant profited from his wrongdoing." *Blatt*, 583 F.2d at 1335.  As the SEC points out, courts have found that a defendant should not be permitted to avoid disgorgement by claiming a lack of funds.  *See SEC v. Thorn*, 2002 WL 31412439 at *3 (S.D. Ohio 2002) ("Financial hardship does not preclude the imposition of an order of disgorgement.").

Here, the SEC sought to establish the appropriate amount of disgorgement through the testimony of Dr. Prowse, who analyzed the appropriate portion of the profits Defendant received from his two sales of WMI stock to be attributed to the market being unaware of information known to Defendant regarding WMI's first quarter adjustments to income and shortfalls in WMI's second quarter earnings projections.  As previously discussed, Prowse found that the market price of WMI stock would have declined by $2.91 per share, had the information about the nonrecurring items been disclosed to the public in May 1999, when Defendant made his first sale of WMI stock. Prowse used a similar event study to find that the information regarding the shortfalls in WMI's second quarter earnings projections would have caused the market price of WMI stock to decline by $18.42 per share, had this information been disclosed to the public in June 1999, when Defendant made his second sale of WMI stock.  To calculate Defendant's gain from this non-public information, then, Prowse multiplied the number of shares Defendant sold on May 17, 1999 by the $2.91 figure, for a total gain of $16,018.  Prowse multiplied the number of shares Defendant sold on June 9, 1999 by both the $2.91 figure and the $18.42 figure, since Defendant arguably was aware of both the first quarter adjustments and the shortfalls in second quarter earnings projections at this time, for total gains of $7,863 from the information regarding the first quarter adjustments, and $49,738 from the information regarding shortfalls in second quarter earnings projections.  Adding up the gains from both sales, Prowse concluded that Defendant had improperly gained $73,620 from using non-public information.

Defendant raises several arguments against Prowse's calculations and against an order of disgorgement.  Defendant again asserts that Prowse's calculation of the effect of the first quarter adjustments information on WMI's stock is improperly based upon the false "truth" that WMI's first quarter 1999 income actually included $95 million in nonrecurring adjustments.  Defendant also argues that Prowse's calculations of the effect of the second quarter earnings information on WMI's stock is improperly based upon a May 28, 1999 flash report and the testimony of the area vice presidents as to the projections that they made for their areas in April 1999.  Defendant urges that both the flash report and the area vice presidents' projections are unreliable.  Moreover, Defendant asserts that Prowse's analysis is based upon the false assumption that Defendant knew, at the time of his June 9, 1999 sale, that WMI would not meet its second quarter earnings projections.  Defendant's expert witness, Bruce Den Uyl, also testified as to the speculative nature of Prowse's analysis.

While the Court appreciates the speculative nature of calculating the market impact of certain information, courts cannot avoid making a decision because the decision is difficult or because exactitude is not feasible.  On the facts of this case, disgorgement is appropriate.  As already noted, in weighing the factors as to whether injunctive relief and an officer/director bar should be imposed, the balance is in Defendant's favor.  As to the lesser sanction of disgorgement, the balance is struck in favor of the SEC.  It is both reasonable and appropriate to require Defendant to divest himself of the profits, or avoided losses, of his actions.  Additionally, the jury's verdict demonstrates that it found that Defendant possessed and used material, non-public information in his transactions of WMI stock on May 17 and June 9, 1999.  Although he explained the speculative nature of Prowse's calculation, Den Uyl could not offer the Court an alternative estimation of Defendant's gains from this use of non-public information.  Accordingly, finding Prowse's calculations to be a reasonable approximation of the profits causally connected to

17

Defendant's use of non-public information, the Court **GRANTS** the SEC's request for disgorgement of $73,620.

The SEC additionally asserts that prejudgment interest should be added to this figure. *Blatt*, 583 F.2d at 1335 ("The court's power to order disgorgement extends only to the amount *with interest* by which the defendant profited from his wrongdoing.") (emphasis added). Defendant argues, on the contrary, that the Court should exercise its discretion and refuse to award prejudgment interest, in recognition of the significant losses that Defendant also suffered from his May and June 1999 transactions of WMI stock. *See SEC v. United Energy Partners, Inc.*, 88 Fed. Appx. 744, 747 (5th Cir. 2004) (reviewing a district court's award of prejudgment interest on a disgorgement amount for abuse of discretion). That Defendant also suffered losses from his transactions, however, does not negate the gains that he improperly recognized. In order to prevent Defendant from being unjustly enriched, then, the Court finds that prejudgment interest is proper. Because Defendant raised no specific objection to the SEC's calculation of prejudgment interest, the SEC's request for $41,853.39 in prejudgment interest is **GRANTED**. This figure represents the entire amount of the Court's award of prejudgment interest. No additional interest shall accrue between the ending date of the SEC's calculation, which appears to be June 30, 2006, and the entry of final judgment.

Accordingly, Defendant is **ORDERED** to disgorge $73,620.00, plus prejudgment interest of $41,853.39, for a total of $115,473.39.

**E. Civil Penalties**

Finally, the federal securities laws authorize the imposition of civil money penalties both for fraudulent reporting and for insider trading. Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), and Section 20(d)(1) of the Securities Act, 15 U.S.C. § 77t(d)(1), authorize the imposition of civil money penalties for violations of those statutes, namely, for filing a

materially false and misleading financial statement, or for aiding and abetting such a violation.  A three-tier range of penalty amounts may be imposed.  Under 17 C.F.R. 201.1001, Table I, the maximum penalty amounts are $5,500 under the first tier, $55,000 under the second tier, and $110,000 under the third tier.  Second tier penalties may be imposed where the defendant's violation "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. §§ 78u(d)(3)(B)(ii), 77t(d)(2)(B).  Third tier penalties may be imposed where the defendant's violation additionally "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."   15 U.S.C. §§ 78u(d)(3)(B)(iii)(bb), 77t(d)(2)(C)(II).

Likewise, Section 21A(a)(1) of the Exchange Act, 15 U.S.C. § 78u-1(a)(1), allows a court to impose a civil money penalty for insider trading, the amount of which "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale or communication."  15 U.S.C. § 78u-1(a)(2).  Profit gained or loss avoided is defined as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information."  15 U.S.C. § 78u-1(f).

Courts may examine a number of factors in determining whether civil penalties should be imposed, including many of those discussed above in relation to injunctive relief and an officer/director bar.  *See, e.g.*, *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (setting forth the following general factors relied upon by courts in imposing penalties:   (1) the egregiousness of the violations at issue; (2) the defendant's degree of scienter; (3) the repeated nature of the violations; (4) the defendant's failure to admit wrongdoing; (5) whether the violations created substantial losses or the risk thereof; (6) the defendant's lack of cooperation or

honesty with authorities; and (7) whether the penalty should be reduced because of the defendant's demonstrated current and future financial condition).

Here, Defendant argues that civil penalties should not be awarded on account of the suffering that he has already undergone and will continue to experience in the future. Defendant points out that he has lost his prospects for a position as Chief Financial Officer at WMI, and that his prospects for ever again obtaining employment with corporate America are virtually nonexistent. Defendant likewise notes that he has faced more than a ninety percent decrease in income, and that he may lose his accounting license as a result of this litigation. Defendant urges that this, in combination with the emotional turmoil faced by him and his family, shows that no additional deterrence is needed.

Conversely, the SEC argues that Defendant has merely suffered the normal consequences of violating the law, that, because he has maintained his innocence throughout this action, he is not entitled to sympathy, and that he has exaggerated his loss of career and financial opportunities. The SEC points to the compensation that Defendant received from WMI until he left in early 2003, and to the income of between $85,000 and $105,000 that Defendant earned in 2005. The SEC further urges that Defendant has not shown financial hardship or the likelihood of losing his CPA license with any certainty, and that Defendant admitted that leaving his position at WMI also gave him more time to spend with his family.

The SEC's arguments trivialize the devastating effects that Defendant has suffered on account of this litigation. Having heard the testimony presented at the remedies hearing, the Court finds that Defendant's prospects of ever again working for a public company are nonexistent, and his chances for employment in accounting at a level even remotely commensurate with his education and experience are very close to nonexistent. Having been precluded from working for certain of Linduff's clients as a result of the jury's verdict against him, Defendant is no longer able

to earn a high income, or perhaps even a modest one.  Defendant has amply demonstrated the financial hardship and extreme emotional toll that he has suffered, the effects of which he will likely experience for years into the future.  This hardship and Defendant's current financial situation indicate that imposing civil penalties would be inappropriate.

Likewise, the factors already considered by the Court counsel against awarding civil penalties.  The lack of egregiousness of the violations at issue, the isolated nature of Defendant's actions, the sincerity of Defendant's assurances against future violations, and his current and future financial condition weigh strongly against the imposition of civil penalties.  Although the jury found that Defendant was at least severely reckless in his actions, in light of these other circumstances, civil penalties are not warranted.  Accordingly, the Court declines to impose civil penalties for either Defendant's false reporting violation or his insider trading violations, and the SEC's request for civil penalties is **DENIED**.

## III. CONCLUSION

On the matter of relief to be awarded in this case, the Court finds as follows.  Defendant is **ORDERED** to disgorge $73,620.00, plus prejudgment interest of $41,853.39, for a total of $115,473.39.  The SEC's requests for other forms of relief, including a permanent injunction, an officer/director bar, and civil money penalties are **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 22nd day of August, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT